

FILED

# In the United States District Court

# For the Eastern District of Virginia

## Alexandria Division

| | |
|---|---|
| ISA SAHARKHIZ, MEHDI SAHARKHIZ, and ADDITIONAL PRESENTLY UNNAMED AND TO BE IDENTIFIED INDIVIDUALS, | ) ) ) )  Civil Action No. 1:10CV912 (AJT\|TRJ) |
| **Plaintiffs,** | ) ) |
| v. | ) )  **COMPLAINT FOR TORT DAMAGES** |
| NOKIA CORPORATION (FINLAND), NOKIA INC., a Delaware Corporation, SIEMENS A.G. (GERMANY), SIEMENS CORPORATION, a Delaware Corporation, NOKIA SIEMENS NETWORKS B.V. (NETHERLAND), NOKIA SIEMENS NETWORKS US LLC, a Delaware Corporation, AND OTHER PRESENTLY UNNAMED AND TO BE IDENTIFIED CORPORATE DEFENDANTS AND UNNAMED AND TO BE IDENTIFIED INDIVIDUAL EMPLOYEES OF SAID CORPORATIONS, | ) )  **AND INJUNCTIVE RELIEF** ) ) ) ) ) )  **JURY TRIAL DEMANDED** ) ) ) ) ) ) |
| **Defendants.** | ) ) |

# COMPLAINT

Plaintiffs, by and through their attorneys, allege upon personal knowledge and belief as to their own circumstances, and upon information and belief as to all other matters, that substantial

evidentiary support exists or will exist after a reasonable opportunity for further investigation and discovery as a result of trial proceedings, in support of the following:

1.      Systemic human rights violations by the current repressive Iranian government over the last decade are well known, widely publicized and have given that government a rank among the worst offenders of human rights by international human rights organizations, such as Amnesty International. Since January 19, 1984, the government of Iran has been designated on the U.S. Department of States list of "State Sponsors of Terrorism;" the Iranian government is the most active state sponsor of terrorism and one of only four countries that are still remaining on that list. The States Department singled out the Islamic Revolutionary Guard Corps ("IRGC") and Ministry of Intelligence and Security in Iran ("MOISIR") for their direct support and planning of terrorism operations around the world.

2.      On May 3, 2010, marking the World Press Freedom Day, President Obama remarked, "Iran, following its crackdown on dissent after the last elections, now has more journalists behind bars than any other nation." He added that we have "to sound the alarm about restrictions on the media as well as the threats, violence or imprisonment of many of its members and their families because of their work."

3.      On June 12, 2010, Secretary of State Hillary Rodham Clinton commented on the anniversary of Iran's disputed presidential election by stating that the "Iranian government's denial of the fundamental freedoms and rights accorded to its citizens in the Iranian constitution and international treaties to which Iran is a party has drawn broad international condemnation." She further stated that "many political prisoners continue to suffer in jail, some facing death sentences for expressing their opinions."

2

4.     Named Plaintiff and additional unnamed and to be identified Plaintiffs (hereinafter referred to collectively as "Plaintiffs") have been and are being subjected to brutal treatment in violation of some of the most universally recognized standards of international law, including prohibitions against torture, arbitrary arrest, detention without trial, disappearances, incommunicado detentions, forced confessions, extrajudicial killings, cruelty and various other forms of degrading treatment. With the technological assistance provided by Defendants, Iranian officials acting under the authority of the Islamic Republic of Iran persecuted Plaintiffs for exercising their basic and fundamental human right of freedom of speech, association, and assembly.

5.     Defendants knowingly, negligently and willfully provided the infamous, abusive and oppressive Iranian government with sophisticated devices for monitoring, eavesdropping, filtering, and tracking mobile phones. The devices enabled Iranian officials to access private voice conversation, text messages, user phone numbers, and other identifying information about the Plaintiffs as well as the nature and content of their use of electronic communications. This information was produced only through the use of Defendants' provided equipment. The Defendants' sale to and training of Iranian government officials knowingly and willfully aided and abetted the commission of arbitrary arrest, unlawful detention, torture, and other major human rights abuses violating United States and international laws, causing Plaintiffs' severe physical and mental suffering.

6.     Defendants had every reason to know and understand that the sophisticated devices they provided the oppressive Iranian government could will be used to inflict such abuses on the people of Iran by their brutal government. Despite this knowledge and

understanding, Defendants helped the Iranian government increase its unlawful monitoring of its citizens and inflict said abuses on them.

7.     Plaintiffs' claims are actionable under the Alien Tort Statute ("ATS"), 28 U.S.C. § 1350, and the Torture Victim Protection Act ("TVPA"), 28 U.S.C. § 1350, because their injuries resulted from violations of specific, universal, and obligatory standards of international law as embodied in a number of treaty obligations binding on the United States and implemented domestically here in the United States by a number of statutes including the TVPA.

8.     Defendants' conduct breaches United States law under the Comprehensive Iran Sanctions, Accountability, and Divestment Act of 2010, 111 P.L. 195, by exporting prohibited sensitive technologies that restrict the free flow of unbiased information in Iran or disturb, monitor, or restrict the speech of the Iranian people.

9.     Defendants' conduct also breaches United States law under the Electronic Communications Privacy Act by exceeding their authorization to access and control highly private and potentially damaging information concerning Plaintiffs' electronic communication, in violation of 18 U.S.C. §§ 2510 et seq, by intentionally acquiring and/or intercepting the contents of electronic communications sent by and/or received by Plaintiffs through their use of cell phone and other electronic devices which were part of, and utilized in, Defendants' electronic communications systems, in violation of 18 U.S.C. § 2511, and/or manufacturing, distribution intercepting devices in violation of 18 U.S.C. § 2512.

10.     Plaintiffs seek general, compensatory, and punitive damages for their injuries, as well as declaratory and injunctive relief to hold Defendants accountable for their unlawful actions, to secure the Defendants' assistance in obtaining the Plaintiffs' release from prison and

to prevent the Iranian government from using Defendants' technology in torturing and harming

others in the future. Plaintiffs also seek relief that would prevent Defendants from similarly

harming others in the future in other similarly situated countries.

## JURISDICTION AND VENUE

11.     This Honorable Court has jurisdiction over Plaintiffs' claims under 28 U.S.C. §

1331 (federal question jurisdiction), 28 U.S.C. § 1350 (ATS) and 28 U.S.C. § 1350 (TVPA).

ATS provides federal jurisdiction for "any civil action by an alien for a tort only, committed in

violation of the law of nations or a treaty of the United States." TVPA supplements and confirms

ATS by providing federal jurisdiction for acts of torture, as defined by 28 U.S.C. § 1350. The

Electronic Communications Privacy Act, 18 U.S.C. § 2510 et seq., provides federal jurisdiction

for civil claims arising from unauthorized disclosure of electronic communications and customer

information.

12.     This Court also has supplemental jurisdiction over claims arising from violations

of state law because, pursuant to 28 U.S.C. § 1367, the facts in the claims arising from state law

are so related to the Plaintiffs' claims under federal laws that they form part of the same case or

controversy under Article III of the United States Constitution.

13.     This Court has personal jurisdiction over Defendants. Defendants have

purposefully availed themselves of the laws of the Commonwealth of Virginia and have engaged

in business activities in the Commonwealth and in this judicial district. Upon information and

belief, Defendants' business activities in the Commonwealth have been continuous and systematic. Further, Defendants have purposefully directed their activities at residents of the Commonwealth. Moreover, the assertion of personal jurisdiction over Defendants is both reasonable and fair.

14.     Venue is proper in this district pursuant to 28 U.S.C. §§ 1391(a), (b), and (c).

## INTRADISTRICT ASSIGNMENT

15.     Assignment and venue in the Alexandria Division is proper pursuant to Local Rule 3(B) (1) and (C) because Defendant Nokia Siemens Networks US LLC is located in, does business in, and has substantial business contacts with this district and division. Other named and unnamed Defendants are similarly subject to the jurisdiction of this court by virtue of their corporate ties and/or business contacts and activities in this jurisdiction.

## PARTIES

### *Plaintiffs*

16.     Plaintiff, **Isa Saharkhiz,** is a citizen, and resident of the Islamic Republic of Iran. He is a journalist and former head of the press department at the Iranian Ministry of Culture and Education. Mr. Saharkhiz sues on behalf of himself for the injuries, including pain and suffering,

he has endured as a result of his torture, cruel, inhuman or other degrading treatment, and arbitrary arrest and prolonged detention by the current oppressive Iranian Regime. Isa was unlawfully arrested and arbitrarily detained, tortured, beaten and prosecuted for publishing journals and articles that supported democratic reform in Iran and for communicating with other democracy advocates. He has been imprisoned without trial since June 20, 2009. Isa was held in solitary confinement for more than eighty days; his ribs were broken in the struggle that took place during his arrest; and his health condition is deteriorating because of physical tortures and lack of medical care in the detention centers where he is held. The injuries, humiliation, torture and unconscionable human rights abuses were inflicted upon him as a result of the Defendants' actions in aiding and abetting the undemocratic, tyrannical and repressive Iranian government.

17.     Plaintiff **Mehdi Saharkhiz,** the son of Plaintiff Isa Saharkhiz, is a resident of the State of New Jersey. He sues on behalf of himself for the injuries, including pain and suffering, he has endured as a result of his father's torture cruel, inhuman or other degrading treatment, and arbitrary arrest and prolonged detention by the current oppressive Iranian Regime. Mehdi has suffered extreme emotional distress from the loss of Isa's presence and lack of information about his location, fate, health, treatment and general well-being. In addition, he and his father are suing for compensation for loss of property, income, opportunity and economic distress in conjunction with Isa's arbitrary arrest and prolonged detention. All of those injuries, including pain, suffering and loss of property, were inflicted upon him as a result of the Defendants' actions in aiding and abetting the undemocratic, tyrannical and repressive Iranian government's humiliation, torture and unconscionable human rights abuses against his father, the journalist Isa Saharkhiz.

18.     Plaintiffs temporarily designated, as "Presently Unnamed and To Be Identified"

are citizens of Iran currently living in Iran or in exile in other countries, such as the United

States. Those Plaintiffs endured severe injuries, including pain and suffering, as a result of the

arbitrary arrest and prolonged detention, torture, and cruel, inhuman or other degrading treatment

by the current oppressive Iranian Regime. All of those injuries, humiliation, torture and

unconscionable human rights abuses were inflicted upon them as a result of the Defendants'

actions in aiding and abetting the undemocratic, tyrannical and repressive Iranian government in

violations of United States and international law, including federal and state laws that provide

civil actions for Defendants' acts. At the time of this filing and based on information currently

available, Plaintiffs and their attorneys have identified as many as 1500 individuals imprisoned

in Iran. The cruel and illegitimate arrests and detention of all of these unnamed individuals may

be linked to actions by the Defendants that revealed private electronic communication

identifying their private information to Iranian government officials. Additional information

about their arrests and detention, and their treatment in detention, as well as information on how

the Defendants are responsible for their abuse, will be obtained in greater detail after a

reasonable opportunity for further discovery.

### *Defendants*

19.     Upon information and belief, Defendant **Nokia Corporation** ("Nokia Corp.") is a

corporation duly formed and existing under the laws of the Republic of Finland, with its

executive offices located at Keilalahdentie 4, FIN-00045 Nokia Group, P.O. Box 226, Espoo, Finland, and its principal United States offices at 102 Corporate Park Drive, White Plains, New York 10604. Upon information and belief, Nokia Corp. is doing business in the Eastern District of Virginia and elsewhere. Nokia may be served with process by serving its registered agent, James C Brincefield, 526 King Street, Alexandria, Virginia 22314.

20.    Upon information and belief, Defendant **Nokia, Inc.** is a corporation, duly formed and existing under the laws of the state of Delaware and has a principal place of business at 102 Corporate Park Drive, White Plains, New York 10604. Nokia Inc. is a subsidiary of Nokia Corporation. Nokia Inc. is doing business in the Eastern District of Virginia and elsewhere, and having designated a registered agent for service of process in Virginia at 526 King Street, Alexandria, Virginia 22314. (Defendants Nokia Corp. and Nokia Inc. will be referred to collectively as "Nokia.")

21.    Upon information and belief, Defendant Nokia operates a business concerned primarily with telecommunication devices, internet services, digital mapping and navigation services and most importantly, equipment and services for communications networks globally, all designed to facilitate electronic communication and the sharing of information. By the nature of its activities, Nokia has access to and provide services capable of identifying information about individuals using its electronic devices and networks.

22.    Upon information and belief, Defendant Nokia ships, sells, or offers to sells its products in the Commonwealth of Virginia, including into this district and has substantial contacts with this judicial district.

23.    On information and belief, Defendant **Siemens Aktiengesellschaft** ("Siemens

AG") is a German corporation with its principal place of business at Wittelsbacherplatz 2, D-80333 Munich, Germany and maintains offices at 153 East 53rd Street, New York, New York 10022. On information and belief, this Defendant may be served at Wittelsbacherplatz 2, D-80333 Munich, Germany via an officer, a managing or general agent, or any other agent authorized by appointment or by law to receive service of process. Siemens AG manufactures a wide range of industrial and consumer products, and builds locomotive, traffic control systems, and automotive electronics and engineers electrical power plants. It also provides *public and private communications networks*, computer building control systems, medical equipment and electrical components.

24. On information and belief, Defendant **Siemens Corporation** ("Siemens Corp.") is a Delaware corporation with its principal place of business at 153 E. 53rd Street, 56th Floor, New York, New York 10022. Siemens Corp. is a subsidiary of Siemens AG. Siemens Corp. is doing business in the Eastern District of Virginia and elsewhere, and having designated a registered agent for service of process in Virginia at CT Corporation System, 4701 Cox Road, Suite 301, Glen Allen, Virginia 23060. (Defendants Siemens AG and Siemens Corp. will be collectively referred to as "Siemens.")

25. Upon information and belief, Defendant Siemens has consented to personal jurisdiction in the Courts of the Commonwealth of Virginia and this judicial district by registering with the Virginia State Corporation Commission to do business in the Commonwealth. Further, upon information and belief, Defendant Siemens has authorized its agents or affiliated companies to offer its products for sale in this district.

26. Upon information and belief, Defendant **Nokia Siemens Networks B.V.** ("NSN

BV") is a corporation duly formed and existing under the laws of the Netherlands, Trade register

number: 34259706, with its executive offices located at Karaportti 3, P.O. Box 1 FI-02022 Nokia

Siemens Networks, 02610 Espoo, Finland, and its principal United States offices at 5555

Glenridge Connector, Suite 800 Atlanta, Georgia 30342. Upon information and belief, NSN BV

is doing business in the Eastern District of Virginia and elsewhere, including having a principle

place of business at 575 Herndon Parkway, Suite 200 Herndon, Virginia 20170.

27.     Upon information and belief, NSN BV began operations in the third quarter of

fiscal 2007 and includes the carrier-related operations of Siemens and the Networks Business

Group of Nokia. NSN BV is a leading supplier in the telecommunications infrastructure industry.

NSN BV, the ultimate parent of the Nokia Siemens Networks group and Defendant Nokia

Siemens Networks US LLC, is owned approximately 50% by each of Nokia and Siemens and

consolidated by Nokia with equity accounting by Siemens. Nokia effectively controls NSN BV

as it has the ability to appoint key officers and the majority of the members of its Board of

Directors and, accordingly, Nokia consolidates Nokia Siemens Networks on its financial

statements.

28.     Upon information and belief and after a reasonable opportunity for further

discovery, Defendant **Nokia Siemens Networks US, LLC** ("NSN US") is a Delaware

corporation with its principal place of business at 1040 Crown Pointe Pkwy, Suite 900, Atlanta,

Georgia 30338. Defendant NSN is a subsidiary of NSN BV. NSN is doing business in the

Eastern District of Virginia and elsewhere, and having designated a registered agent for service

of process in Virginia at National Registered Agents Inc., 201 North Union Street, Suite 140,

Alexandria, Virginia 22314. (Defendants NSN BV and NSN US will be collectively referred to

11

as "NSN.") Operating in 150 countries, NSN is one of the largest telecommunications hardware, software and professional services companies in the world. NSN, jointly owned by Nokia and Siemens, provides wireless and fixed network infrastructure, communications and networks service platforms, as well as professional services to operators and service providers. By the nature of its activities, NSN has access to and provide services capable of identifying information about individuals using its electronic devices and networks.

29.    The additional, presently Unnamed and To Be Identified Corporate Defendants listed in the caption heading of this case are presently unnamed and to be identified corporate entities that contributed to or aided and abetted the violations of international law suffered by Plaintiffs as set out in this complaint, either directly or indirectly via their corporate ties. Additional information about these unnamed entities will be obtained during discovery, allowing the Parties to ascertain the exact nature and extent of the relationships between these unnamed entities and the already identified Defendants. Identifying information about them and the role they played in the abuses will be identified and described in greater detail after a reasonable opportunity for further discovery.

30.    The additional, presently unknown Unnamed Individual Defendants listed in the caption heading of this case are presently unnamed and to be identified employees of the Defendant companies, and/or other persons whose individual actions contributed to or aided and abetted the violations of international law suffered by Plaintiffs as set out in this complaint. Identifying information about them and the role they played in the abuses are expected to be identified and described in greater detail after a reasonable opportunity for further discovery.

## STATEMENT OF FACTS

### *General Facts*

31.     Iran is ranked among the worst offenders of human rights in the last decade by
international human rights organizations, such as Amnesty International. The United States
Department of State issued a statement recognizing that Iran has "drawn broad international
condemnation" for denying its citizens of fundamental freedoms and rights accorded in the
Iranian constitution and international treaties to which Iran is a party. The international
community has exposed and condemned the Iranian government's treatment of journalists,
academics, activists, and ordinary citizens voicing political dissent. Iran responds to political
dissent with intimidation, arbitrary detentions and criminal prosecution, torture, and other forms
of persecution. There are numerous reports documenting the Iranian government's widespread
censorship of newspapers, journals, and books. These reports further detail the pattern of
harassment, arrests, torture, and mistreatment of publishers, journalists, and writers in Iran.
Iran's actions are in violation of numerous protections for fundamental rights of freedom of
expression, association, and assembly under the Iranian Constitution and international law.

32.     Under the administration of President Mahmoud Ahmadinejad, beginning in
2005, Iran's human rights record "has deteriorated markedly" according to the group Human
Rights Watch. Months-long arbitrary detentions of "peaceful activists, journalists, students, and
human rights defenders," often charged with "acting against national security," have intensified
under President Ahmadinejad. In December 2008, the United Nations General Assembly voted
to express "deep concern" for Iran's human rights record. Following the protests over Iran's 2009

Presidential Election, dozens of Iranians were killed and hundreds were arrested. Moreover,

several journalists were arrested or beaten, foreign media were barred from leaving their offices

to report on demonstrations, and websites and bloggers were threatened.

33.     The Iranian government, through the Ministry of Information and Communication

Technology ("ICT"), the state-owned Telecommunication Company of Iran ("TCI"), and the

Ministry of Intelligence and National Security of the Islamic Republic of Iran ("MISIRI"), has

been imposing monitoring and censoring electronic communications on a widespread basis.

34.     Iran broadly uses unlawful interception in violation of international rules,

including the International Telecommunication Union ("ITU") rules on lawful interception. Iran

has at least three distinctive procedures for interception. The first procedure allows law

enforcement agencies to submit an inception request to a judge, and after issuance of an order,

ICT executes the interception. A representative of the judiciary would oversee the process. The

second procedure allows security personnel from different agencies stationed in ITC to order an

interception without any court order. The third procedure gives MISIRI access to the

communication data available at the monitoring centers. MISIRI intercepts and performs a wide

range of content filtering autonomously without any oversight or any requirements to report to

authorities or to ICT personnel who are legally responsible for interception. The two latter

procedures are not legal under the Iranian Constitution or any internationally accepted norms.

35.     The Iranian government repeatedly utilizes illegal procedures in censoring and

monitoring its citizens. Numerous reports indicate that the security forces and secret police of

Iran use the gathered information along with identifying data, such as the physical location of

dissenting citizens to suppress them. The government's tracking and monitoring, according to

international press as well as a number of international organizations' reports, have lead to arbitrary arrests, prolonged detentions, incommunicado detentions, extrajudicial killings, rape, torture, and cruel, inhuman or degrading treatment and punishment by the Iranian government.

36.    In 2008, Defendants delivered intelligence monitoring centers to ITC which is primarily owned by the Islamic Revolutionary Guard Corps ("IRGC"), the same group that was singled out by the U.S. Department of States for its direct involvement in terrorism operations around the world. The technology supplied by Defendants allows Iranian government authorities to monitor any communications across a network, which includes voice calls, text messages, instant messages, and web traffic. This monitoring system can also interrogate data to see what information is being passed back and forth.

37.    Defendants knowingly and willingly delivered very capable and sophisticated equipment for unlawful intercepting, monitoring, and filtering of electronic communications ("Intelligence Solutions") to Iranian officials. Intelligence Solutions consists of "Monitoring Centers" and "Intelligence Platforms," which offer tailored solutions for interception, monitoring and intelligence analysis. Intelligence Solutions further enables authorities to block communication, reveal confidential information, and alter the date for disinformation purposes.

38.    In effect, Defendants are directly involved in the unlawful censoring and monitoring of journalists, activists, and citizens in Iran by supplying the government of Iran with the technology needed to perform interceptions, monitoring, controls, content filtering, deep packet filtering, and network scanning.

39.    Defendants knew or should have known of these unlawful methods of interception, monitoring, and filtering by government of Iran. Defendants had knowledge of the

monitoring centers' design and implementation. In addition, Defendants had knowledge of autonomous access of MISIRI and other intelligence organs of Iran. On June 2, 2010, Barry French, the executive board member and head of marketing and corporate affairs of NSN, during the European Parliament's Subcommittee on Human Rights hearing on new information technologies and human rights, admitted both that NSN provided a monitoring center to Iran in 2008 and that, at that time, there were "credible reports from Iran that telecommunications monitoring has been used as a tool to suppress dissent and freedom of speech."

40.     A number of human rights organizations responded to news of the Defendants delivering Intelligence Solutions to Iran with criticism.  Similarly, Nobel Peace Prize winner, Shirin Ebadi accused Defendants of supporting Iran's repression and censorship by knowingly providing the government with monitoring software and technology. Reports of arrests and detentions of human rights activists in Iran, prior to the June 2009 Presidential Elections, suggest that the government of Iran had access to private communications of its citizens.

41.     Human rights abuses in Iran increased in the aftermath of the 2009 Presidential Election. The total number of arrests across Iran since the election was reported as more than 1250. On August 11, 2009, the Iranian government confirmed that 4000 individuals were detained or arrested during the protests. Iran's Prosecutor General, Ghorban Ali Dorri Najafabadi, acknowledged that some protesters arrested in the aftermath of the disputed presidential election were tortured. United Nations independent human rights experts also voiced their grave concern about the use of excessive police force, arbitrary arrests and killings in Iran and called upon the Government to uphold its international human rights obligations.

42.     Defendants had every reason to know and understand that the Intelligence

Solutions they provided to the Iranian government could will be used to inflict such abuses on the people of Iran by their brutal government.

43.     Despite this knowledge and understanding, Defendants helped the Iranian government increase its unlawful monitoring of its citizens by providing it with sophisticated devices for monitoring, eavesdropping, filtering, and tracking mobile phones which enabled Iranian officials to access private voice conversation, text messages, user phone numbers, and other identifying information about the Plaintiffs and the nature and content of their use of electronic communications.

44.     This information was produced only through the use of Defendants' provided equipment. The Defendants' selling, maintaining, and training of Iranian government officials knowingly and willfully aided and abetted in the commission of torture, arbitrary arrest and other major human rights abuses violating United States and international laws and causing Plaintiffs' severe physical and mental suffering.

45.     Defendants, by entering into the above-mentioned business relationship with the Iranian government, subsequently profited from the violations of the Plaintiffs' fundamental human rights.

### *Specific Facts*

### <u>Isa Saharkhiz</u>

46.     Mr. Isa Saharkhiz is a distinguished journalist, a newspaper chief editor and

publisher, an activist for political reform, a champion of democratic freedom and of the freedom

of the press and a fierce critic of the current oppressive regime in Iran.

47.     From 1982 to 1992, Isa was a reporter and economics expert for the Islamic

Republic News Agency ("IRNA"), controlled by the Iranian Ministry of Culture and Islamic

Guidance (known as "Irshad"). In the last two years of the Iran-Iraq War, he reported on Iran's

military operations directly from the front line.

48.     After working for five years in the United States running IRNA's office in New

York, Mr. Isa Saharkhiz returned back to Iran to be in charge of IRNA's domestic publications.

His return marked the beginning of a brief, though monumental and influential period of

relatively open and free press in Iran, known as the "Tehran Spring." Mr. Saharkhiz, along with

the Deputy Minister of Irshad, Ahmed Bourghani, were considered the chief architects of that

period.

49.     Mr. Isa Saharkhiz played an important and instrumental role in the establishment

of several reformists, professional and journalistic organizations in Iran including the Society of

Iranian Journalists, the Society of Young Journalists, the Society of Women Journalists and the

Society of Freelance Journalists.

50.     Isa was a founding member of the distinguished and outspoken Society for the

Defense of Freedom of the Press ("SDFP") in Iran. SDFP fought against the oppressive tactics of

the Iranian regime, its relentless censorship and suppression of a free press and the constant

harassment and imprisonment of journalists in Iran. Moreover, Mr. Saharkhiz helped create the

Golden Pen Award, named after an award given by the international Association of World

Journalists, which is given annually by SDFP to distinguished advocates for the freedom of the

press in Iran.

51.     The Tehran Spring ended when the regime closed several reformist publications and forced the resignation of Deputy Bourghani and Saharkhiz in 1999.

52.     Unrelenting, Isa Saharkhiz founded after his resignation two prominent publications: the daily "Akhbar-E Eqtesad," (Farsi for "Economic News") and the reformist monthly magazine "Aftab" (Farsi for "Sunshine"). The publications were an expose and a critic of the corrupt economic practices of the religious hardliners in the Iranian government. Several distinguished and influential Iranian literary figures published their work in them.

53.     In 2003, Mr. Saharkhiz was convicted in a sham trial, banning him for a year from working for the government and ending his official influence on Iranian press.

54.     By 2004, the hardliners have had enough and ordered their closure, for insulting the "supreme religious leader," the "Grand Ayatollah" in Iran, a manufactured excuse to shut down the voices of advocates for economic and democratic reform in the country.

55.     Not to be dissuaded, believing in the importance of his fight for his countrymen freedom from their government oppressors, Isa continued to publish a regular column online on the daily "Rooz," (Farsi for "literally day") a reformist publication of exiled Iranian journalists, where he continued his direct attack on the Grand Ayatollah as the real driver of government oppression.

56.     In aftermath of the 2009 Presidential Election in Iran, widely criticized internationally as a rigged election, Isa wrote an article directly aimed at the Grand Ayatollah for being a hypocrite and accusing him as the chief architect of the election coup. Isa, subsequently, went into hiding and fearing for his life, left the capitol Tehran and fled to the small village of

Tirkadeh in the northern province of Mazandaran in Iran.

57.     Shortly before his arrest by the government primary intelligence agency, the
MISIRI on June 20, 2009, Isa told a German weekly publication, the "Der Spiegel", "I am on the
run and change homes all the time. *I turn on my mobile phone only one hour each day, because
they can trace me and arrest me. "* (emphasis added) " Little did Mr. Saharkhiz know that MISRI
had the capability of monitoring all of his phone conversations and identifying his location
largely due to the sophisticated monitoring equipments sold to them and serviced by Defendants.

58.     Moments before his arrest Isa said: "when we were young, one of our honors was
that we would establish a government whose foundation will be "neither East nor West," its
symbol peace and friendship. The mark of humanity of its citizens - "comfort in the two worlds
follows these words: compassion for friends and tolerance for enemies." But what is happening
these days, 30 years after the Revolution, indicates that this was just a dream for us, because the
Supreme Leader of the Islamic Republic has proven that he is willing to do anything just to
continue a little longer his dictatorial rule over people."

59.     During his arrest, six MISIRI officers beat Isa so heavily that they broke his
thoracic rib cage and wrists. While he was in agonizing pain and without receiving any medical
care, the officers callously drove Mr. Saharkhiz over 250 miles to "Evin" prison in Tehran. Only
after severe criticism of their cruel mistreatment, did Isa receive a brief and inadequate medical
treatment at Evin prison for his severely inflicted injuries.

60.     To this day, Mr. Saharkhiz is unable to sleep and breathe at the same time due to
the untreated damage to his rib cage. He is continuously denied painkillers as well to relieve his
constant agonizing pain even temporarily. Isa was placed in solitary confinement in a small cell

room for eighty days and later housed with very violent inmates. The solitary cell was a room sizedabout four by six feet and is without air circulation. He had no access to cold water and was even denied visitation or communication with his family members. All were measures designed to inflict severe pain and suffering on one the Iranian government's harshest critics.

61.     Mr. Saharkhiz remained in jail in a constant state of pain, since his arrest in June 2009, without ever being tried. His family in Iran has been subjected to continued police surveillance, which caused them to fear for their own safety and personal security. Isa's daughter was beaten by security forces during a search of their house.

62.     Isa's son, Plaintiff Mehdi Saharkhiz, suffers nightly from nightmares and emotional breakdown, deprived of the company and guidance of his father. Mehdi spends hours daily in support of his father's defense from afar at a great economic and emotional stress.

63.     As in executor of his mother's will, Isa was unable to care and manage an orphanage in Iran which was provided for in her will. As a result, several orphans were left without care or shelter.

64.     On Sunday, August 1, 2010, Mr. Saharkhiz received an Opinion of the United Nations Working Group on Arbitrary Detention, which declared his detention by the Iranian government to be "arbitrary," and consider reparations owed to Mr. Saharkhiz for his arrest and detention.

## CAUSES OF ACTION

65.   Plaintiffs' causes of action arise under and violate the following laws, agreements, conventions, resolutions, and treaties:

(a)   Alien Tort Statute, 28 U.S.C. § 1350;

(b)   Torture Victim Protection Act, 28 U.S.C. § 1350;

(c)   Convention against Torture and Other Cruel, Inhuman, or Degrading Treatment or Punishment G.A. res. 39/46, annex, 39 U.N. GAOR Supp. (No. 51) at 197, U.N. Doc. A/39/51 (1984), *entered into force* June 26, 1987;

(d)   International Covenant on Civil and Political Rights, G.A. res. 2200A (XXI), 21 U.N. GAOR Supp. (No. 16) at 52, U.N. Doc. A/6316 (1966), 999 U.N.T.S. 171, *entered into force* Mar. 23, 1976;

(e)   Universal Declaration of Human Rights (1948) G.A. res. 217A (III), U.N. Doc A/810 at 71;

(f)   Charter of the United Nations (1945), **adopted** June 26, 1945, 59 Stat. 1031, T.S. 993, 3 Bevans 1153 (*entered into force* October 24, 1945);

(g)   The Electronic Communications Privacy Act, 18 U.S.C. § 2510 et seq.; and

(h)   Statutes and common law of the Commonwealth of Virginia, including but not limited to assault and battery, false imprisonment, negligence, intentional infliction of emotional distress, and negligent infliction of emotional distress.

## FIRST CLAIM

### (Torture, a Violation of International Law
### for which the Alien Tort Statute and
### the Torture Victim Protection Act Provide Relief)

66.     Plaintiffs repeat, re-allege and incorporate herein by reference the allegations set forth in the foregoing paragraphs of this Complaint as if fully set forth herein.

67.     The Defendants' acts described in this Complaint caused direct and severe physical and mental pain and suffering to the Plaintiffs and placed them at severe risk of personal injury and/or death in connection with their participation in, and support of, the peaceful exercise of their rights of free speech and communication, free association, and the right to hold, exercise and express their political beliefs.

68.     Defendants' acts constitute torture in violation of the Torture Victim Protection Act ("TVPA"), 28 U.S.C. § 1350.

69.     Because Defendants' acts described herein violated multiple provisions prohibiting torture on an absolute basis including: (1) treaties binding on the United States, (2) statutes adopted by the United States Congress implementing those treaty obligations, (3) international and domestic judicial decisions applying and interpreting the prohibition against cruel, inhuman, or degrading treatment or punishment, (4) administrative regulations and international and domestic judicial decisions applying and interpreting the prohibition against torture, and (5) a number of specific, universal, and obligatory standards that are recognized to be part of customary international law, these acts constitute "tort[s] ... committed in violation of

the law of nations or a treaty of the United States" under the Alien Tort Statute ("ATS"), 28

U.S.C. § 1350.

70.     Defendants aided and abetted and/or ratified these acts of torture in violation of

international, federal, and state law. These violations and actions meet the definition of torture

under the meaning of the TVPA, the ATS, and international treaties and U.S. laws and

regulations, as well as customary international law, which condemn torture on an absolute basis,

irrespective of the reasons why the abuses are inflicted.

71.     The Plaintiffs are therefore entitled on this basis to compensatory and punitive

damages, in amounts to be established at trial, and to such other declaratory and/or injunctive

relief as may be deemed appropriate.

## SECOND CLAIM

### (Cruel, Inhuman or Degrading Punishment or Treatment or Punishment, Violations of International Law for Which the Alien Tort Statute Provides Relief)

72.     Plaintiffs repeat, re-allege and incorporate herein by reference the allegations set

forth in the foregoing paragraphs of this Complaint as if fully set forth herein.

73.     Acts of cruel, inhuman, or degrading treatment or punishment suffered by the

Plaintiffs designated in this Claim, including physical injury and the severe physical and mental

suffering associated therewith, were inflicted upon them by the joint and collusive actions of the

Defendants and Iranian government officials acting under color of law, through unlawful or

unauthorized actions prohibited by international law.

74.    These acts had the intent and the effect of grossly humiliating, debasing, intimidating, and punishing the Plaintiffs, forcing them to act against their will and conscience, inciting fear and anguish, and seeking to break their physical and/or moral resistance.

75.    These acts of cruel, inhuman, or degrading treatment and punishment were inflicted on the Plaintiffs for purposes that include, among others, preventing them from exercising their free speech and free association rights, and punishing them for exercising their right to have and communicate political beliefs.

76.    Because the acts described herein violated the prohibitions against cruel, inhuman, or degrading punishment or treatment including: (1) treaties binding on the United States, (2) statutes adopted by the Congress of the United States implementing those treaty obligations, (3) international and domestic judicial decisions applying and interpreting the prohibition against cruel, inhuman, or degrading treatment or punishment, (4) administrative regulations and international and domestic judicial decisions applying and interpreting the prohibition against cruel, inhuman or degrading treatment or punishment, and (5) a number of specific, universal, and obligatory standards that are recognized to be part of customary international law, these acts constitute "tort[s] . . . committed in violation of the law of nations or a treaty of the United States" under ATS, 28 U.S.C. § 1350.

77.    Defendants knowingly aided and abetted and/or ratified these abuses, and did not act to prevent or punish these violations of human rights as embodied in international law.

78.    Defendants are liable for aiding and abetting and/or ratification of the commission of these abuses under this cause of action.

79.     The Plaintiffs are therefore, entitled on this basis to compensatory and punitive damages in amounts to be established at trial, and to such other declaratory and/or injunctive relief as may be deemed appropriate.


## THIRD CLAIM

**(Arbitrary Arrest and Prolonged Detention,
a Violation of International Law for Which the Alien Tort Statute and
the Torture Victim Protection Act Provide Relief)**

80.     Plaintiffs repeat, re-allege and incorporate herein by reference the allegations set forth in the foregoing paragraphs of this Complaint as if fully set forth herein.

81.     These acts of arbitrary arrest and long-term detention suffered by the Plaintiffs designated in this Claim, including arrest and detention for an unlawful purpose in violation of the rights to freedom of speech, association, and assembly, were inflicted upon them by the joint and collusive actions of the Defendants and Iranian government officials acting under color of law, albeit through unlawful or unauthorized actions and for unlawful and unauthorized purposes.

82.     These acts caused direct physical and mental pain and suffering upon the Plaintiffs, caused loss of their liberty and property, and placed them at severe risk of personal injury in connection with their participation in, and support of, the peaceful exercise of their rights of free speech and free association, and their rights to hold, exercise and express their political beliefs.

83.     Because the acts described herein violated provisions prohibiting arbitrary arrest

and prolonged detention, including: (1) treaties binding on the United States, (2) statutes adopted

by the United States Congress implementing those treaty obligations, (3) international and

domestic judicial decisions applying and interpreting the prohibition against arbitrary arrest and

prolonged detention, (4) administrative regulations and international and domestic judicial

decisions applying and interpreting the prohibition against arbitrary arrest and prolonged

detention, and (5) a number of specific, universal, and obligatory standards that are recognized to

be part of customary international law, these acts constitute "tort[s] ... committed in violation of

the law of nations or a treaty of the United States" under ATS, 28 U.S.C. § 1350.

84.     Defendants aided and abetted the carrying out of these abuses, and did not act to

prevent these violations of human rights as embodied in international and domestic law.

85.     Defendants are liable for aiding and abetting and/or ratifying these abuses, as

specified in this cause of action.

86.     Plaintiffs are therefore, entitled on this basis to compensatory and punitive

damages, in amounts to be established at trial, and to such other declaratory and/or injunctive

relief as may be deemed appropriate.

## FOURTH CLAIM

### (Battery)

87.     Plaintiffs repeat, re-allege and incorporate herein by reference the allegations set

forth in the foregoing paragraphs of this Complaint as if fully set forth herein.

88.     Upon information or belief, Defendants intentionally committed acts that resulted in harmful or offensive treatment of Plaintiffs' persons, and produced bodily harm. Plaintiffs did not consent to the contact and treatment that caused injury, damage, loss or harm to Plaintiffs.

89.     The acts described constitute battery, actionable under the laws of the Commonwealth of Virginia and the United States.

90.     Defendants are liable for aiding and abetting and/or ratifying these abuses, as specified in this cause of action.

91.     Plaintiffs are therefore, entitled on this basis to compensatory and punitive damages, in amounts to be established at trial, and to such other declaratory and/or injunctive relief as may be deemed appropriate.


## FIFTH CLAIM

### (Assault)

92.     Plaintiffs repeat, re-allege and incorporate herein by reference the allegations set forth in the foregoing paragraphs of this Complaint as if fully set forth herein.

93.     Upon information or belief, Defendants' conduct caused Plaintiffs to be subjected to numerous batteries and/or intentional invasions of their rights to be free from offensive and harmful contact, and said conduct demonstrated that Defendants had a present ability to subject Plaintiffs to immediate, intentional, offensive and harmful touching.

94.     The acts described herein constitute assault, actionable under the laws of the

Commonwealth of Virginia and the United States.

95.     Defendants are liable for aiding and abetting and/or ratifying these abuses, as set forth in this cause of action.

96.     Plaintiffs are therefore, entitled on this basis to compensatory and punitive damages, in amounts to be established at trial, and to such other declaratory and/or injunctive relief as may be deemed appropriate.


## SIXTH CLAIM

### (False Imprisonment)

97.     Plaintiffs repeat, re-allege and incorporate herein by reference the allegations set forth in the foregoing paragraphs of this Complaint as if fully set forth herein.

98.     Upon information or belief, Defendants intentionally committed acts that resulted in the Iranian government's exercise of force restraining, detaining and confining Plaintiffs on an arbitrary and unlawful basis. The restraint, detention or confinement compelled Plaintiffs to stay or go somewhere against their will for some appreciable time. Plaintiffs did not consent to this restraint, detention or confinement.

99.     Defendants' actions constituted false imprisonment under standards of law applied by the Commonwealth of Virginia and the United States.

100.     Defendants are liable for aiding and abetting and/or ratifying these abuses as specified in this cause of action.

101.   Plaintiffs are therefore, entitled on this basis to compensatory and punitive damages, in amounts to be established at trial, and to such other declaratory and/or injunctive relief as may be deemed appropriate.

## SEVENTH CLAIM

### (Intentional Infliction of Emotional Distress)

102.   Plaintiffs repeat, re-allege and incorporate herein by reference the allegations set forth in the foregoing paragraphs of this Complaint as if fully set forth herein.

103.   Upon information or belief, Defendants, by providing Monitoring Centers to Iran, engaged in conduct adversely affecting Plaintiffs with reckless disregard of the high probability that it would cause Plaintiffs to suffer severe abuses and emotional distress. Plaintiffs were present at the time the outrageous conduct and these results occurred and the Defendants knew or should have known that Plaintiffs were present and would be adversely affected.

104.   Plaintiffs suffered severe abuse and emotional distress as a result of the conduct of the Defendants.

105.   Defendants' conduct constitutes intentional infliction of emotional distress and is actionable under the laws, standards, and causes of action as set forth in this complaint.

106.   Defendants are liable for aiding and abetting and/or ratifying these abuses as set forth in this cause of action.

107.   Plaintiffs are therefore, entitled on this basis to compensatory and punitive

damages, in amounts to be established at trial, and to such other declaratory and/or injunctive relief as may be deemed appropriate.

## EIGHTH CLAIM

### (Negligence)

108.    Plaintiffs repeat, re-allege and incorporate herein by reference the allegations set forth in the foregoing paragraphs of this Complaint as if fully set forth herein.

109.    Upon information or belief, Defendants failed to use ordinary or reasonable care in order to avoid supplying the oppressive Iranian authorities with monitoring technology. Defendants' negligence was a cause of injury, damage, loss or harm to Plaintiffs.

110.    As a result of these acts, Plaintiffs suffered harm including, but not limited to, severe emotional distress. Defendants' conduct constitutes negligence and is actionable under the causes of action as set forth in this complaint.

111.    Defendants are liable for aiding and abetting and/or ratifying these abuses as specified in this cause of action.

112.    Plaintiffs are therefore, entitled on this basis to compensatory and punitive damages, in amounts to be established at trial, and to such other declaratory and/or injunctive relief as may be deemed appropriate.

## NINTH CLAIM

**(Violation of the Electronic Communications Privacy Act, 18 U.S.C. §§ 2510 et seq,
Interception and disclosure of wire, oral, or electronic communications prohibited)**

113.     Plaintiffs repeat, re-allege and incorporate herein by reference the allegations set

forth in the foregoing paragraphs of this Complaint as if fully set forth herein.

114.     Upon information and belief, Defendants violated the rights of Plaintiffs herein by

intercepting, disclosing, and/or intentionally using electronic communication between Plaintiffs

and other persons. The right of a civil action arises under 18 U.S.C. 2520 (a), which provides that

"any person whose wire, oral, or electronic communication is intercepted, disclosed, or

intentionally used in violation of this chapter (*18 USCS §§ 2510 et seq*) may in a civil action

recover from the person or entity, other than the United States, which engaged in that violation

such relief as may be appropriate."

115.     Defendants intentionally acquired and/or intercepted the contents of electronic

communications sent by and/or received by Plaintiffs through the use of an electronic device.

Defendants intentionally acquired the communications that had been sent from or directed to

Plaintiffs through their use of computers and other electronic devices which were part of, and

utilized in, Defendants' electronic communications system, in violation of 18 U.S.C. § 2511.

116.     Defendants unlawfully committed the prohibited acts to enhance their business in

Iran.

117.     Plaintiffs are "person[s] whose ... electronic communication is intercepted ... or

intentionally used in violation of this chapter" within the meaning of 18 U.S.C. § 2520.

118.     Defendants manufactured and distributed intercepting devices to Iran in violation

32

of 18 U.S.C. § 2512. Defendants' manufactured and distributed intercepting devices have been used in intercepting and disclosing plaintiffs' electronic information which resulted in Plaintiffs' unlawful detentions, arbitrary arrest, torture and physical harm.

119.    Defendants are liable directly and/or vicariously for this cause of action.

120.    Plaintiffs therefore, seek remedy as provided for by 18 U.S.C. § 2520,  including such preliminary and other equitable or declaratory relief as may be appropriate, damages consistent with subsection (c) of that section to be proven at trial, punitive damages to be proven at trial, and a reasonable attorney's fee and other litigation costs reasonably incurred.

## TENTH CLAIM

### (Violation of the Comprehensive Iran Sanctions, Accountability, and Divestment Act of 2010; 111 P.L. 195, 111 H.R. 2194)

121.    Plaintiffs repeat, re-allege and incorporate herein by reference the allegations set forth in the foregoing paragraphs of this Complaint as if fully set forth herein.

122.    Defendants manufactured and exported Intelligence Solution to Iran in violation of the Comprehensive Iran Sanctions, Accountability, and Divestment Act of 2010. Intelligence Solutions is sensitive technology as defined under the Act since these equipments restricted the free flow of unbiased information in Iran and/or disturbed, monitored, or restricted the speech of the people of Iran.

123.    Plaintiffs therefore, demand injunctive relief prohibiting the agencies of the

United States from entering into or renew contracts with Defendants. In addition, Plaintiffs demand injunctive relief prohibiting Defendants from exporting sensitive technology to Iran.

## ABSENCE OF AVAILABLE AND EFFECTIVE REMEDIES IN IRAN

124.    These claims are not precluded by the need or failure to exhaust local remedies as set out in the Torture Victim Protection Act since Plaintiffs have made every effort to seek local remedies in Iran and their efforts have proven pointless and futile.

125.    Plaintiff Isa Saharkhiz has attempted to utilize domestic remedies, pleading the laws of Iran, but those attempts were blocked by the government of Iran. There are no remedies available to him under current Iran's judicial structure. He exhausted all possible remedies available to him in Iranian courts.

126.    Any further efforts to obtain relief in Iran could well result in serious reprisals against those making allegations of wrongdoing on the part of high level officials in the Iranian government or intelligence security officers as well as against any local attorney representing a Plaintiff there.

127.    For these reasons, requirements for further exhaustion of efforts to obtain local relief should be considered waived and satisfied.

## PRAYER FOR RELIEF

WHEREFORE, the Plaintiffs pray for judgment against Defendants Nokia Corporation, Nokia Inc., Siemens AG, Siemens Corporation, Nokia Siemens Networks B.V., Nokia Siemens Networks US LLC and Other Presently Unnamed and To Be Identified Corporate Defendants and Presently Unnamed and to be Identified Individual Employees of Said Corporations, as follows:

(a)    For actual and compensatory damages to each of the Plaintiffs according to proof to be established at trial;

(b)    For punitive and exemplary damages according to proof to be established at trial;

(c)    For declaratory relief determining that the actions of the Defendants constituted violations of international law, specifically, that such violations included prohibited acts of torture, cruel, inhuman or degrading treatment, and arbitrary arrest and prolonged detention for the peaceful and exchange of ideas, views, and political beliefs in violation of the Convention Against Torture, numerous other international treaty obligations binding on the United States, and domestic laws and regulations implementing such standards, including the Torture Victim Protection Act, and other enumerated causes of action in this Complaint;

(d)    For affirmative action by the Defendants to secure the release of the detainees;

(e)    For injunctive relief to stop any further disclosures of user information in order to prevent such aforementioned abuses from taking place in the future;

(f)    For costs of the litigation, including, attorneys' fees; and

(g)    For such other relief as the Court deems just and proper.


## JURY TRIAL DEMAND


Plaintiffs hereby demand a jury trial on all issues triable by jury including, but not limited

to, those issues and claims set forth in any amended complaint or consolidated action.


Respectfully submitted this 16th day of August, 2010,


By: _____
Edward E. Moawad
(VA State Bar No. 78842)
MOAWAD & HERISCHI, LLP
5425 Wisconsin Avenue, Suite 600
Chevy Chase, Maryland 20815
Phone: (301) 968-2380
Fax:    (301) 263-7169
Email: Edward.moawad@mh-lawfirm.com

Of Counsel:
Ali Herischi
MOAWAD & HERISCHI, LLP
5425 Wisconsin Ave, Suite 600
Chevy Chase, MD, 20815
Email: ali.herischi@mh-lawfirm.com

*Attorneys for Plaintiffs*